## GUNTER v. LAFFAN.

Parties cannot avoid the consequences of their acts, knowingly and voluntarily done.

Where a judgment is rendered in this Court, reversing the judgment of the Court below, and remanding the case for further proceedings, it becomes the law of the case, and it must be adhered to, though erroneous.

Tenants-in-common, or partners, have a right to acquire their co-tenants' or co-partners' interest, by purchase under an execution-sale—there being nothing in their relations to forbid it.

Plaintiffs must come into a Court of Chancery with clean hands, otherwise they are not entitled to relief.

APPEAL from the Superior Court of the City of San Francisco.

This cause first came before this Court on the appeal of both parties from the decree and portions thereof of the Court below, and was reversed and remanded for further proceedings at the October Term, 1856, of this Court.

The case was then re-tried in the Court below, and a decree identical with the first one rendered, from which the defendants appealed, both parties stipulating that the transcripts of the proceedings at both the trials should be used as the record on the second appeal. Both records, taken together, exhibit the following facts:

On the twelfth of September, 1849, Laffan, Coit, and Morse, were the owners of a lot of ground in the city of San Francisco, fronting on Clay street, and lying between Dupont street and Brenham Place. They then entered into a written contract with Adler and Chappelle, by which they sold them a portion of the lot for thirty-three thousand dollars, to be used for the purposes of a theatre; and as to the remaining portion of the lot, it was agreed between the parties—

1. That Laffan, Coit, and Morse, should hold the legal title, and that Adler and Chappelle should improve the property by erecting buildings thereon.

2. That it should be regarded as partnership property, the value of the land representing the interest of defendants, and the value of the improvements, the interest of Adler and Chappelle.

3. That the buildings should be let, and the net profits divided between the partners, in proportion to their respective interests.

4. That the premises should be let as fast as buildings could be erected.

5. That part of the premises might be sold when it could be done to advantage.

6. That a treasurer should be appointed to keep the books of the concern, to collect the income and distribute the profits, according to the respective shares of the parties.

7. That this arrangement was to continue for the term of three years, the premises then to be divided; or they might be sold, and the proceeds divided; or they might be again leased, for the common benefit of the parties.

Subsequently, Henry Gunter, the plaintiff in this suit, became subrogated to all the rights of Adler and Chappelle in the contract, with the exception of the theatre lot.

Afterwards, Gunter erected a large iron building on the premises, at a cost of eighty-six thousand dollars, which was afterwards leased to the United States for a post-office, at a monthly rent of seven thousand dollars. In this lease Gunter joined. This house was leased on the first of February, 1850. A portion of the lot not covered by the Portsmouth House was sold by Laffan, Coit, and Morse, to the county, in June, 1850, and another portion was let for the purpose of building Wilson's Exchange, in September, 1850.

Laffan acted as the treasurer and book-keeper of the concern, and collected its revenues.

Gunter borrowed a large sum of money of one J. J. Starkey, and in order to secure it executed and delivered to Starkey an instrument in the nature of a deed of trust on his interest in the concern, which authorized Starkey to collect his portion of the rent, and also whatever money might be due him under the contract.

Starkey received under the trust upwards of twelve thousand dollars, but before his debt was paid, a judgment was obtained in the Superior Court by Lockwood, Hackett & Judah, for four thousand dollars, against plaintiff Gunter, which judgment, defendant Holmes, as the attorney-at-law of defendant Laffan, purchased for the sum of one thousand dollars, under which he caused the entire interest of Gunter to be sold, Holmes, acting for Laffan, becoming the purchaser thereof. Prior to the sale under this judgment, Starkey, as trustee, filed a bill against Laffan et al., for settlement of the rent account, which case was compromised, and a contract entered into by Starkey, as trustee of Gunter, by which a certain sum was to be paid to Starkey on account of the interest of Gunter, and an interest in the property of two-fifths secured to Gunter. After Holmes bought at the sale and had obtained the sheriff's deed of Gunter's interest, he

38

sold to one S. L. Burritt, the attorney of Starkey's executor, two-thirds of the interest purchased by him at the sheriff's sale, which interest was re-sold to Holmes for six thousand dollars in three per cent. scrip, by Burritt. This arrangement between Holmes and Burritt was' known to Gunter, who claimed the benefit thereof, and charged that Burritt acted as his attorney in the matter. Gunter afterwards not being able to procure a settlement with Burritt regarding this six thousand three per cent. scrip, of which he claimed one-half, assigned his claim therefor for a valuable consideration, to Peck & Wilson, who instituted a suit against Burritt therefor, in the Superior Court, which suit is still pending. In this case, Peck and Wilson examined Gunter as a witness, by having his deposition taken, which was afterwards used in the suit.

The substance of Gunter's testimony in this suit was, that he was familiar at the time, with the negotiations between Holmes and Burritt, and that he had acquiesced in the arrangement made by them; and that he knew of the sale of his interest acquired by Burritt, for the six thousand dollars in scrip, and had agreed with Burritt to take one-half of the same as his part.

The decree of the Court below declared the deed from the sheriff to Holmes void, as he was the mere attorney of Laffan in procuring the same; and that as Laffan had money in his hands at the time, sufficient to pay the debt which belonged to Gunter, and that as Laffan's position was one of trust and confidence, he could not take advantage of his position to sell out his co-tenant or co-partner, and become the purchaser of the same.

Also, that the interest of Gunter in the property remained unaffected by the sale; and that an account be taken between the parties on the basis of the original agreement, except that it holds the compromise of Starkey valid up to that point of time.

Starkey died in 1852, but on his death-bed admitted that, by July of that year, Gunter's debt to him would be fully paid.

Between the interval of the first and second appeal in this case, Henry Gunter died, and his wife, as administratrix, was substituted as plaintiff in this case. On the trial of this case, the deposition of Gunter, taken in the case of Peck & Wilson *v.* S. L. Burritt, was introduced in evidence by the defence, also the complaint, which was sworn to by Henry Gunter, on behalf of the plaintiffs, Peck & Wilson. There was some evidence going to show that a portion of the money collected by defendants for rent of the premises, was expended by them in the construction or purchase of Wilson's Exchange, which the plaintiff claimed the right to follow, and to be entitled to an account of the rents derived from the same. The Court below in its decree, excluded that property, and the rents derived therefrom, from its final decree; and plaintiff's appeal was confined to such refusal by

the Court below. Defendants appealed from the final decree and all the interlocutory proceedings.

*C. H. S. Williams, Wm. Blanding,* and *Jo. G. Baldwin,* for Defendants and Appellants.

*J. B. Hart, S. M. Bowman,* and *S. Heydenfeldt,* for Plaintiff and Respondent.

MURRAY, C. J., delivered the opinion of the Court on the first appeal—HEYDENFELDT, J., and TERRY, J., concurring.

Admitting that the conduct of Laffan and Holmes, in the purchase of Gunter's interest in the premises in dispute, was a fraud upon his right; or at least a transaction so reprehensible in all its particulars as to raise the presumption of unfair dealing, and warrant a Court of Equity in setting it aside, I am of opinion that the sale was ratified by Gunter, and this I think is clearly shown by his testimony in the case of Peck and Wilson against Burritt, in which he admits that he knew of the compromise of the two-thirds interest between Holmes and Burritt, and the surrender of the Lockwood judgment, and consented to it, and afterwards agreed to the re-sale to Holmes for six thousand dollars, in county scrip, one-half of which he allowed to Burritt on settlement.

The evidence, to my mind, establishes the fact beyond a doubt, that he knew, at the time, that the six thousand dollars was paid for his remaining interest, whatever it might be, in the premises. For what else could it have been paid? The purchase of the judgment of Lockwood, Hackett and Judah, by Laffan and Holmes, and the sale under it, could not cut out Starkey's mortgage; he at least had a lien, until the debt due from Gunter to him was paid. The deed to Starkey was executed on the seventh of March, 1850, and the Lockwood judgment obtained January 20, 1851. Gunter consented to the arrangement by which the Lockwood judgment was assigned, and the two-thirds interest in the property, and the re-sale of this interest for six thousand dollars, was approved by him, as appears by his testimony. In fact, having assented to this arrangement, and assigned his interest in the matter to Peck and Wilson, it is difficult to see how he can now come into Court and claim relief against the consequence of his own acts, knowingly and voluntarily done.

Judgment reversed, and cause remanded.

MURRAY, C. J., delivered the opinion of the Court on the second appeal—TERRY, J., concurring.

When this case was here before, the decree of the inferior Court was reversed, and the cause remanded. It was understood by the Court that after the discharge of Starkey's debt,

there was a balance left, which had come to the hands of Laffan before the date of Holmes' purchase, and the judgment of the Court should have ordered an account as to that sum, reversing the decree in every other particular. If it had not been for this one circumstance, this Court would have dismissed the bill, and ordered a final judgment for the defendant. Upon the *remittitur's* going down, however, without any specific directions to the Court below, the parties have undertaken to try the case *de novo*, by procuring some additional testimony bearing on the point upon which the first decision was based.

Ordinarily, such a practice would not be tolerated. After the plaintiff had come to this Court upon a statement agreed upon as containing the facts and evidence of his case, and a judgment has been pronounced against him, going to the whole merits of the controversy, it would be exceedingly improper to allow him an opportunity to alter or change the facts upon a second trial. Such a practice would open the door to frauds and perjuries innumerable.

But we do not think that the additional evidence which was introduced on the second trial alters the case at all. After balancing the testimony, we are satisfied that the preponderance is still greatly in favor of the defendants, and abundantly substantiates the fact that the plaintiff ratified and confirmed the sale from Burritt to Laffan. To enter into a detail of that evidence, and our opinion upon it, would be alike unprofitable and unpleasant.

This is the first instance in which I have ever known a party attempt to gain a case by proving that he had, on a former occasion, perjured himself, and it may be well doubted whether, if the original plaintiff was alive, he would have consented to such a sacrifice of personal honor for the whole subject of this litigation. If the proceeding is not novel in law, it at least contravenes that Christian and charitable maxim " *de mortuis nil nisi bonum,*" which should be law.

The facts being substantially the same in this as the former record, it results that the first judgment is the law of this case, even if it was erroneous. Dewey *v.* Gray, 2 Cal., 374. But we do not place our opinion on this ground alone, we are satisfied that the former opinion of this Court was correct. The appellant contends that the sheriff's sale of Gunter's interest to Laffan was void, and second, that it was not affirmed by Gunter with full knowledge of the facts.

Upon the first point, it cannot be denied that Gunter's interest was the subject of levy and sale upon execution. Then, if the sale was void, it must be on the ground of fraud in fact, or fraud in law. There is no evidence to show that there was any fraud in fact upon the part of the defendant. The purchase was made under a regular judgment, at an open and public judicial sale,

and if there was any fraud in the transaction, it arose from the relation of the parties toward each other.

In the first place, the plaintiff and defendants were not partners—they had separate interests; the one in the house, the other in the land. There was no community of profit and loss, or interest in the *residuum*, but a division of rents agreed on. Even if they were tenants-in-common, or partners, there is no rule of law which would forbid one partner or tenant-in-common from purchasing at a judicial sale, particularly under a judgment not obtained by him.

There was nothing in the former relations of the parties which gave Laffan an unfair advantage, or the means of information superior to others, so as to enable him to sacrifice the rights of Gunter. The sale was of a certain interest in property, not of a share in rents and profits due. The deeds by which that interest was held were of record, and the title open and notorious. Any one desirous of purchasing, could have ascertained the value of the interest as easily as Laffan.

Laffan was not at the time the trustee of Gunter, for Gunter had disposed of his interest to Starkey, neither did Laffan have any money of Gunter's in his hands. In addition to all this, Gunter was present at the sale, and having full knowledge of all that transpired, never forbid it in any manner. But even if the sale was fraudulent, as we remarked in our former opinion, the testimony shows, beyond doubt, that Gunter assented to it, with full knowledge of all the facts.

The learned counsel for the respondent contends that the plaintiff was mistaken as to the true import of the conversation between himself and the witness Burritt. We think not; we have his sworn declarations made in a judicial proceeding, which it is the theory of the law to consider as true, whatsoever may be the fact otherwise, and this is corroborated by the testimony of another, and a disinterested witness. Now, admitting for the sake of argument, that he was mistaken, and that his declarations were not true, this mistake should be established by positive and overwhelming proof, not by raising a doubt, or poising the scales so nicely that a breath would turn them.

But the respondent contends that the sale being void, the title was still in Gunter, and could only be ratified by a written conveyance from him; even if the sale were void, the deed was good, and carried with it the legal title until it was set aside by a Court of Equity. This has never yet been done, and the bill filed in this case does not ask that the sale may be set aside, and the deed canceled. If, then, Burritt bought for Gunter, the title was still in Burritt, subject to Gunter's equities, and if Burritt conveyed the property with the approval of Gunter, who received a portion of the proceeds, the conveyance was good as against him, and he would be estopped from denying or avoiding it; so,

on the other hand, if Burritt bought for himself, and by reason of some relation between them, Burritt was the trustee, and held the legal title for Gunter's use, a conveyance, under like circumstances, would be conclusive upon him.

If there was no other point in this case, except the fact that this conveyance is still outstanding, and that the plaintiff has not, nor does not, seek to set it aside, it would be fatal to a recovery. Besides all this, Gunter, who has received large benefits from this sale, must come into Court with clean hands, and make restitution, before equity would interfere in his behalf.

Judgment reversed, and bill dismissed.